IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOSEPH A. RAINWATER                                            PLAINTIFF

v.                              Civil No. 10-2155

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Joseph Rainwater, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying his claim for a period of disability, disability insurance benefits ("DIB"), and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"),

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine

whether there is substantial evidence in the administrative record to support the Commissioner's

decision.  *See* 42 U.S.C. § 405(g).

## I.    Procedural Background:

The plaintiff filed his applications for DIB and SSI on December 11, 2006, alleging an

onset date of June 15, 2004, due to anxiety; depression; paranoid schizophrenia; antisocial

personality disorder; arthritis; hypertension; problems with his right lower extremity; and,

breathing problems.  Tr. 33, 37, 39, 117-127, 161-172, 181-182, 204-206, 207-208.

An administrative hearing was held on November 24, 2008.  Tr. 22-59.  Plaintiff was

present and represented by counsel.  At this time, plaintiff was 33 years of age and possessed the

equivalent of a high school education.  Tr. 27-28.  He had past relevant work ("PRW") experience

as a forklift operator, draw bench operator helper, and poultry clean up worker.  Tr. 55, 144-159,

163, 183-190.

On November 19, 2008, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's osteoarthritis and mood disorder did not meet or equal any Appendix 1 listing. Tr. 69.  The ALJ determined that plaintiff maintained the residual functional capacity ("RFC") to perform medium level, unskilled work involving interpersonal contact incidental to the work performed.  Tr. 71-74.  With the assistance of a vocational expert, the ALJ then found that plaintiff could perform work as a grounds keeper, dishwasher, and material handler.  Tr. 74-75.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on March 12, 2010.  Tr. 1-3.  Subsequently, plaintiff filed this action.  ECF No. 1.  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  ECF No. 12, 13.

## II.  **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Id.*  "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision."  *Id.*  As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

2

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.    The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has ehngaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 404.1520, 416.920 (2003).

### III.    Evidence Presented:

Records dated prior to Plaintiff's alleged onset date indicate he had been treated for back pain, muscle spasms in the lumbosacral spine, pain between his shoulders, pharyngitis, bronchitis,

AO72A
(Rev. 8/82)

left ankle arthritis, weakness, epididymitis, inguinal adenopathy, hematuria, flu, dysphagia, and depression/anxiety. Tr. 251-281, 313-340. An x-ray of his lumbar spine dated March 2004 was negative. Tr. 331. Plaintiff underwent an esophagogastroduodenoscopy ("EGD") in January 2004, which revealed grade III erosive esophagitis, punctuated gastric ulcers, duodenitis, and atrophic gastritis. Tr. 337. He was placed on Prevacid. X-rays of his chest and thoracic spine conducted in May 2004 revealed no abnormalities. Tr. 261, 330.

On February 7, 2005, Plaintiff complained of left ankle pain, degenerative bone disease, weakness, nausea, vomiting, and diarrhea. Tr. 248-249. He felt he had an upper respiratory infection. Some minor swelling was noted in his ankle, but no other abnormalities were evident. Dr. Stephanie Russell diagnosed him with degenerative joint disease of the left ankle by history and an upper respiratory infection. She prescribed Naproxen. Tr. 249.

On July 24, 2006, Plaintiff sought emergency treatment for a boil on his upper right buttock. Tr. 243-246. Multiple boils were also noted on his legs. Plaintiff felt weak and reported a history of osteoarthritis. He was placed on MRSA protocol, as Dr. Joseph Kradel believed this to most likely be MRSA. The doctor voiced some concern as to whether Plaintiff could afford the medication, given that he had placed him "off work."[1] Tr. 243-246.

On December 20, 2006, Plaintiff was treated for a sore throat, left posterior ear pain, a cough, and general aches and pains. Tr. 240. No wheezes, rales, or rubs were noted. An examination revealed enlarged tonsils. Dr. Russell diagnosed him with an upper respiratory infection. Tr. 240.

---

[1]At this time, Plaintiff was reportedly working at Tyson's. Tr. 243.

4

On January 11, 2007, Plaintiff sought treatment for complaints he believed to be associated with either lung, brain, or bone cancer. Tr. 239. By report, his throat hurt, he had a cough and saw blue spots when he coughed, his left ankle hurt, his left knee was popping, and he had a history of polysubstance abuse. Plaintiff also reported a history of rhumatoid arthritis. The doctor noted paranoid thoughts and diagnosed him with a smokers cough. He was advised to quit smoking and seek a mental health evaluation. Tr. 239.

On January 16, 2007, Plaintiff complained of ankle pain with swelling, a pop in his knee, a recurrent sore throat, and a cough. Tr. 238. The doctor noted multiple somatic complaints along with flight of ideas. Plaintiff was diagnosed with increased blood pressure, abnormal thinking, pharyngitis, and pain in his left ankle. An x-ray of his left ankle was ordered, Plaintiff was placed in an ACE bandage, and he was prescribed Allegra, Nasacort, and Piroxicam. He was advised to discontinue the Naprosyn. Tr. 238. The x-ray of his left ankle proved to be negative. Tr. 241. No fracture lines, significant ankle effusion, or soft tissue swelling was noted. Tr. 241.

On January 26, 2007, Plaintiff sought emergency treatment for a cough and congestion. Tr. 285-287. He also reported a sore throat and pain in his thoracic spine when coughing. An examination revealed some productive sputum, mild erythema in the throat without exudate, and generalized expiratory rhonchi without rales or wheezes. A chest x-ray was essentially normal, revealing on a subtle area towards the right costophrenic angle that could represent some slight infiltrate. However, given that it was symmetrical with the other side, Dr. William King felt it was likely a soft tissue shadow. He diagnosed Plaintiff with acute bronchitis and prescribed Doxycycline and Hycotuss expectorant. Plaintiff was again advised to quit smoking. Tr. 286.

On March 21, 2007, Plaintiff's cough continued, and he was convinced he had cancer. Tr. 237. Dr. Russell noted he was a smoker and had been treated for bronchitis in January 2007.

5

Plaintiff stated that he had cut back to ½ package of cigarettes per day.  Dr. Russell noted paranoid thoughts and diagnosed him with abnormal thinking.  She recommended a psychological evaluation, but noted "Plaintiff doesn't want to hear that."  Tr. 237.

On April 19, 2007, Plaintiff underwent a diagnostic interview with Charles Pennington at Western Arkansas Counseling and Guidance Center ("WACGC").  Tr. 343-346.  He complained of persistent depression, although his mood and affect appeared normal.  Mr. Pennington noted that he had been treating Plaintiff for several months at the Next Step Day Room.  Plaintiff reported no history of inpatient psychiatric treatment, and had only tried Zoloft on one previous occasion to treat his depression.  Although he had an extensive history of drug and inhalant abuse, Plaintiff denied any current use of illicit drugs or alcohol and did not appear to be under the influence of any such substances.  Mr. Pennington stated that he had agreed to treat Plaintiff as long as he paid for his sessions and agreed to routine drug testing.  He did voice some concern that Plaintiff could be drug-seeking from the facility, and that it would be up to his doctor or nurse practitioner to determine whether any other medications were appropriate.  At this time, Plaintiff was working at Max Steal on Sundays and was seeking additional hours.  Mr. Pennington diagnosed him with depressive disorder not otherwise specified, inhalant-induced anxiety disorder, cannabis dependence, cocaine dependence, morphine dependence, nicotine dependence, and rule out malingering.  He then assessed him with a global assessment of functioning ("GAF") score of 60.  Mr. Pennington recommended individual therapy and medication management.

On May 21, 2007, Plaintiff met with Mr. Pennington.  Tr. 392-393.  He indicated that he was living with his mother and could not work.  However, Plaintiff also stated that he was working at Max Steal on the weekends.  The frustration associated with living with his mother and having no money reportedly stressed him out.  Mr. Pennington found him to be alert and cooperative with

6

a somewhat expansive and antagonistic mood.  Plaintiff remained convinced he suffered from bipolar and schizophrenia.  However, he had recently met a woman, with whom he had become friends.  Tr. 392-393.

On May 22, 2007, Plaintiff was treated at GSC for recurrent bronchitis.  Tr. 236.  He was out of Albuterol.  Over the previous two weeks, his cough had become productive.  Plaintiff also complained of shortness of breath.  It was noted that he had problems with anxiety and depression, was seeing a psychiatrist, and had applied for disability.  Plaintiff was diagnosed with acute bronchitis and asthma and prescribed Doxycycline.  Tr. 236.

On May 31, 2007, Plaintiff was referred to the emergency room for treatment after experiencing a syncopal spell and a racing heart rate.  Tr. 288-291.  He was noted to have a history of drug abuse routinely causing these symptoms.  However, Plaintiff stated that he had been clean for one month.  He was also noted the be depressed and suffering from a headache.  An examination revealed a small contusion above his right eyebrow, a full range of motion in his neck, and no cyanosis, clubbing, or edema.  A CT scan of his head was negative, showing only mild atrophy.  A chest x-ray was also within normal limits, evidencing no active infiltrates, a normal heart size, and well expanded lungs.  Dr. David Dias diagnosed Plaintiff with hypertension, a history of drug abuse, and depression.  He prescribed Norvasc, and advised Plaintiff to follow up with his primary care physician.  Tr. 289.

On June 6, 2007, records indicate Plaintiff had become hypertensive a WACGC and was sent to the emergency room.  Tr. 386.  He had been admitted to the hospital for cardiac monitoring and testing.  Plaintiff indicated that the Norvasc they prescribed was too expensive for him to fill.  A review of his treatment records indicated that Plaintiff had primarily been normotensive when evaluated by his primary care physicians at GSC.  Plaintiff was smoking eighteen cigarettes per

day, drinking six to eight Cokes daily, and complained of swelling in his feet.  An examination revealed a heavy habitus, poor dental hygiene, poor overall hygiene, an occasional irregular heartbeat, fair femoral pulses, weak pedal pulses, and some edema of the feet.  It appears there was some question regarding his most recent blood work.  The doctor indicated that the blood sample was diluted, and noted the possibility of water intoxication.  He prescribed Atenolol and advised Plaintiff to decrease his intake of Coke and water.  Tr. 386.

On June 7, 2007, Plaintiff presented for a psychiatric evaluation with Dr. Pearl Beguesse, a staff psychiatrist at WACGC.  Tr. 348-352.  He continued to report symptoms of depression, sadness, crying spells, poor sleep, decreased appetite, lack of interest in doing things, hopelessness, helplessness, worthlessness, and suicidal thoughts.  Plaintiff reported a childhood history of court-ordered treatment for behavioral problems.  However, he denied psychotic or manic symptoms, as well as prior hospitalization for psychiatric issues.  Plaintiff did report numerous suicide attempts by overdose on drugs.  His history included tobacco abuse, alcohol abuse, cannabis use, cocaine use, methamphetamine use, and prescription drug abuse.  Plaintiff stated he had not used any alcohol or drugs in over three months.  Dr. Beguesse noted good grooming and hygiene. Plaintiff was cooperative, pleasant, maintained good eye contact, had normal speech, a "pretty good" mood, a broad and non-congruent affect, logical and goal-directed thoughts, full orientation, and good judgment and insight.  Hallucinations and delusions were denied.  Dr. Beguess diagnosed Plaintiff with depressive disorder not otherwise specified, nicotine dependence, cannabis dependence in early full remission, methamphetamine dependence in sustained full remission, cocaine dependence in sustained full remission, and personality disorder not otherwise specified. She assessed Plaintiff with a GAF of 50 and prescribed Fluoxetine to help his symptoms.  Tr. 348-352.

On June 18, 2007, Plaintiff underwent a mental diagnostic evaluation with Dr. Kathleen Kralik.  Tr. 292-300.  Plaintiff alleged problems associated with antisocial personality disorder, paranoid schizophrenia, depression, fatigue, chronic pain.  Dr. Kralik noted that he seemed very invested in diagnostic labels.  Plaintiff admitted researching psychiatric conditions, and indicated that his reference to paranoid schizophrenia was the result of an online questionnaire for schizophrenia.  However, throughout the exam, Plaintiff brought up no symptoms suggestive of psychosis or schizophrenia.  Records reveal no medications prescribed to treat psychotic-like symptoms and Dr. Kralik noted no apparent distress or behavior suggestive of chronic mental illness of psychotic proportions.  When asked if there were any mental reasons he could not work, he stated that he believed he had mental defects.  Upon further probing, Plaintiff reproted that he felt he was bipolar and "definitely schizophrenic."  Plaintiff stated that he did not like people, felt scared all of the time, was nervous a lot, slept odd hours, and was consistently tired.  Tr. 292-300.

Plaintiff denied any current use of drugs or involvement in illegal activity with a "subtle smirk," leading Dr. Kralik to believe there might be some reality base to his fears regarding his safety.  She noted that his alleged symptoms seemed consistent with alcohol and methamphetamine-induced psychotic-like symptoms.  He seemed genuine in his report of depression, though his report of this and fears of passing out seemed more along the lines of an adjustment disorder, more so than a full blow mood disorder.  Most of his other allegations seemed either associated with medical issues, not credible, and/or not described in any manner suggesting they prohibited employment.  Dr. Kralik opined that the timing of his application for benefits also seemed suspect.  She stated that had his drug activities been continuing, this might explain his part-time work schedule (i.e., to privide access to his customers) and his concerns over lost income if he was being more carefully monitored now by law enforcement.  It was, however, her opinion that

9

he did qualify for a diagnosis of antisocial personality disorder. Dr. Kralik diagnosed Plaintiff with polysubstance dependence, allegedly in full remission; adjustment disorder not otherwise specified with mild to moderate impact on occupational functioning with the institution of Prozac; and, antisocial personality disorder. She also assessed him with a GAF score of 51-60. Dr. Kralik concluded that Plaintiff's adaptive functioning/activities of daily living were somewhat impaired secondary to his antisocial tendencies, his social functioning was somewhat impaired for occupational purposes (manipulative and oftentimes not credible), his communication skills adequate, his capacity to cope with the typical mental/cognitive demands was adequate, his ability to attend and sustain concentration on basic tasks was adequate, his capacity to sustain persistence in completing tasks was somewhat impaired due to motivational issues, and his capacity to complete work-like tasks within an acceptable timeframe was somewhat impaired due to volitional motivation issues. As for the validity of the exam, Dr. Kralik noted that Plaintiff's vestiges of intelligence with associated manipulative cognitive adeptness seemed much more prominent and credible than most of his complaints regarding mental symptoms. It was unclear to what extent exaggeration and/or malingering were reflected in his reports, however, even if his symptoms were taken at face value, she noted that Plaintiff acknowledged that his mental symptoms did not preclude occupational functioning. She also found him unable to manage funds without assistance, due to his strong antisocial tendencies, implied interest in building bombs from what he had learned on the internet, and extensive history of methamphetamine manufacture and polysubstance trafficking and abuse. Tr. 292-300.

On June 27, 2007, a physician's progress note indicated that Plaintiff was doing better with fewer headaches and improved sleep. Tr. 385. Records indicate he sold his blood plasma weekly. Plaintiff complained of "swelling," and indicated that he needed medication refills. The doctor did

10

note some trace edema in his limbs.  Plaintiff was diagnosed with mild hypertension and given refills of Atenolol and Proventil.  Tr. 385.

On August 9, 2007, Plaintiff was treated for a productive cough, possible fever, aching on the right side, and back and chest pain.  Tr. 383.  Rales and wheezes were both evident upon examination and did not clear with his cough.  Tr. The doctor at GCS diagnosed him with possible pneumonia.  He was given Rocephin and Depo Medrol injections and prescribed Ibuprofen and Keflex.  Tr. 383.

On August 17, 2007, Plaintiff returned to Dr. Beguesse for medication management.  Tr. 395-396.  Plaintiff had been busy doing yard work, watching television, playing with his cats, and seeing his girlfriend and children.  He felt "kind of" depressed; had a broad, sad, and congruent mood; normal speech; good eye contact; fair concentration; and, good judgment and insight.  His medication was noted to be effective for his targeted symptoms, and he was taking his medications as prescribed.  Dr. Beguesse added Trazadone to help him sleep and increased his Prozac to help alleviate his depressive symptoms.  Tr. 395-396.

On August 23, 2007, Plaintiff complained of a cough, possible fever, general aches, and a sore throat.  Tr. 382.  Some wheezing was noted upon examination.  The doctor at GSC diagnosed Plaintiff with pharyngitis, a cough, and bronchitis.  He then administered Rocephin and DepoMedrol injections.  Tr. 382.

On August 30, 2007, Plaintiff continued to experience problems with coughing, a sore throat, general malaise, and sleeping difficulties.  Tr. 381.  The doctor at GSC noted symptoms consistent with pharyngitis and a possible viral infection.  Plaintiff was administered a Rocephin injection and a chest x-ray was ordered.  Tr. 381.

AO72A
(Rev. 8/82)

On August 31, 2007, Plaintiff reported no depressive or anxious symptoms. Tr. 394, 420. He had reportedly been physically ill for several months, having been diagnosed with bronchitis and pneumonia that was not responding to antibiotics. His session with Mr. Pennington focused on the positive aspects of his life. He reported having helped his mother out recently by fixing her car. Plaintiff stated that he had a good relationship with his mother, that he had a girlfriend he saw on a daily basis, and that he played chess online. He also indicated that he was to begin working at a junk yard the following week, so that he could afford to have the chest x-ray performed that his doctor had recently recommended. Plaintiff was encouraged to focus on his strengths, be thankful for what he had, and to focus on the future. Mr. Pennington noted that he was alert and cooperative with an expansive mood and congruent affect. Tr. 394.

On December 28, 2007, Plaintiff complained of a cough and congestion. Tr. 415, 426. He stated that he needed an updraft machine with routine treatments. An examination revealed mild pharyngeal redness, a tender neck, and bilateral "harsh squeaks" in his lungs. The doctor diagnosed him bronchitis versus pneumonia and prescribed Albuterol via nebulizer treatments and Doxycycline. Tr. 415.

On February 13, 2008, Plaintiff's lung was "less squeaky" than before. Tr. 414, 425. He continued to exhibit a cough with yellow to brown colored sputum. The doctor diagnosed him with chronic bronchitis, prescribed Atenolol, and ordered lab tests and a tuberculosis test. At this time, Plaintiff was smoking one half of a package of cigarettes each day. Tr. 414.

On February 15, 2008, Plaintiff's tuberculosis test was negative and his lungs were clear. Tr. 413, 424. The doctor diagnosed him with chronic bronchitis and advised him to stop smoking. Notes indicate that the doctor was awaiting some lab results, which ultimately revealed low levels

12

of protein, calcium, cholesterol, and LDL.  The doctor noted this to be consistent with selling plasma twice per week.  Tr. 413.

On April 3, 2008, a CT of Plaintiff's chest revealed no acute cardiopulmonary pathology. Tr. 430.  There was, however, some fatty infiltration of the liver.  Tr. 430.

On August 15, 2008, Plaintiff underwent an intake assessment with Dr. Eva Beyga at WACGC.  Tr. 416-419.  It had been approximately five months since his last appointment with Dr. Beguesse and a year since his last psychotherapy session with Mr. Pennington.  Dr. Beyga noted that Plaintiff appeared to be withdrawn and depressed.  He was unmotivated and appeared to have very poor insight into his illness.  However, he denied any recent drug use and reported compliance with his prescribed medications.  He endorsed symptoms of depression and occasional auditory hallucinations.  His affect was flat and inappropriate, his mood depressed, his thought processes tangential, his thought content negative, and his judgment and insight impaired.  Dr. Beyga found no evidence of delusions, although Plaintiff's mother was concerned he was having delusional thoughts.  Plaintiff's remote and immediate memory appeared impaired, as he experienced difficulty reporting his medical history. His intelligence appeared to be below average, he exhibited cognitive deficits possibly consistent with chronic mental illness, his immediate memory was impaired, and he experienced difficulty concentrating. Dr. Beyga diagnosed Plaintiff with depressive disorder not otherwise specified, rule out major depressive disorder, psychotic disorder not otherwise specified, polysubstance dependence in full sustained remission, inhalant-induced anxiety disorder, nicotine dependence, rule out malingering, and rule out antisocial personality disorder.  He also assessed Plaintiff with a GAF of 45.  The doctor noted that Plaintiff had continued to experience depressive symptoms, in spite of being compliant with his medications.  Therefore, he tapered Plaintiff off of the Prozac, prescribed Celexa, adjusted his

13

Respiridone dosage, and advised him to continue taking Trazodone.  Plaintiff was neither homicidal nor suicidal, but was given a hot-line number, should his condition deteriorate. Psychotherapy was also to be reinstated via intensive day treatment.  Tr. 416-419.

On August 21, 2008, Plaintiff presented for therapy stating that he was going to commit suicide. Tr. 421.  When asked about his plan, Plaintiff stated that his smoking had increased, so he was going to die from smoking.  He was alert and cooperative during the session.  Although his mood was depressed, Plaintiff's presentation was normal.  Mr. Pennington found him to be no threat to himself or others.  He also indicated that he could no longer treat Plaintiff, as it had come to his attention that he was also treating Plaintiff's mother, who had a different last name.  Plaintiff was in agreement to transfer to another therapist.  Plaintiff indicated that his mother had asked him to leave her home approximately one month prior.  Mr. Pennington voiced his belief that Plaintiff's mother had wanted him to leave all along, and that Plaintiff was malingering.  He listed the following symptoms in support of his diagnosis: client has clearly exaggerated or invented symptoms in pursuit of his goal to obtain disability, client seeks financial gain, client's facial features or affect have never reflected depression or any other psychiatric illness, client has routinely indicated he wanted disability, client would ask symptoms of a disorder and then state that he had those symptoms, client appeared rehearsed in each session as to his symptoms, client never was able to give the same symptom consistently from one session to the next, client could never relate a hallucination to a purpose, client consistently called attention to his illness of psychosis, and client consistently attempted to take control of the interview and behaved in an intimidating manner.  Tr. 421-422.

On September 22, 2008, Plaintiff was treated by therapist Mark Williams.  Tr. 423. Plaintiff did not appear to object to his transfer to Mr. Williams and was very open about his

14

purported extreme depression.  He made clear that he wanted Mr. Williams to know that he could

not work and had no support other than his mother.  Plaintiff also complained about his back and

general malaise.  He indicated that he and his girlfriend made money selling blood and aluminum

cans.  Plaintiff did not seem to have any incentive to change his current course and did not respond

to suggestions.  Tr. 423.

## IV.   Discussion:

Plaintiff contends that the ALJ erred by failing to develop the record by ordering a

consultative mental evaluation and an evaluation of Plaintiff's pulmonary impairments and

improperly determining Plaintiff could perform a range of medium level work.  As each of these

issues are tied to the ALJ's credibility determination in this case, we will begin our analysis with

an evaluation of Plaintiff's subjective complaints.

### A.   Subjective Complaints/Severity of Impairments:

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to

make an express credibility determination detailing his reasons for discrediting the testimony.

*Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged

is intense enough to cause functional limitations.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir.

2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe

and whether it prevents him from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective

medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the

credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration,

15

frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  *See id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

### 1.   <u>Physical Limitations</u>:

Plaintiff claims disability due to the pain associated with arthritis in his back, neck, shoulder, and ankle.  Medical records do indicate that Plaintiff has been diagnosed with arthritis/degenerative joint disease in his ankle.  However, an x-ray of his ankle in September 2003 showed no pathology.  A second x-ray performed in January 2008 was also negative.  Tr. 238.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

Plaintiff was also treated for arthritis in his back and neck.  X-rays of his lumbar spine were negative, showing no signs of spondylosis.  In March 2004, Plaintiff was prescribed pain medication and advised not to lift more than ten pounds for one week.  Records reveal he was treated on at least seven additional occasions for pain in his back, neck, foot, and ankle.  Tr. 238, However, repeat x-rays continued to show normal findings.  Tr. 241.  *See id.*  And, Plaintiff's treatment has remained conservative in nature, consisting only of oral medications and injections.

16

*See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

Plaintiff has also reported limitations arising from chronic bronchitis, upper respiratory infections, smoker's cough, and shortness of breath.  Tr. 236, 237, 239, 240, 285-287, 381, 382, 383, 414, 415, 425, 426, 430.  The medical evidence of record does document consistent treatment for these impairments.  We note that Plaintiff was prescribed Albuterol to help alleviate his symptoms, and was advised to stop smoking.  Plaintiff did not heed this advice and continued to smoke.  In fact, at the hearing, he testified that he was still smoking.  Tr. 38.  And, as a result, he continued to experience difficulties with bronchitis.  Because medical records reflect that smoking likely caused Plaintiff's lung impairment, we find that his continued smoking amounts to a failure to follow a prescribed course of remedial treatment. *See Kisling v. Chater,* 105 F.3d 1255, 1257 (8th Cir. 1997) (noting that a failure to follow prescribed treatment may be grounds for denying an application for benefits).

Further, chest x-rays performed in May 2007 and again in April 2008 were negative.  Tr. 288-291, 430.  In April 2008, a CT scan of his chest also showed no acute cardiopulmonary pathology.  And, Plaintiff was treated conservatively via antibiotics and pain medications.  *See Forte*, 377 F.3d at 895.  No significant hospital stays or significant loss of lung function has been noted by any of his physicians.  The record contains no reference to Plaintiff's condition even necessitating pulmonary function tests.  In fact, we can find no evidence that Plaintiff even told his doctors that his bronchitis was of such severity as to limit his ability to perform activities.  There is also no evidence to show that his doctors limited his activities based on his lung related diagnoses. *See Eichelberger v. Barnhart*, 390 F.3d 584, (8th Cir. 2004) (holding fact that none of doctors reported functional or work related limitations due to Plaintiff's headaches created basis

17

for questioning her credibility). Instead, he continued to work part-time, perform yard work, and play with his cats. Tr. 395-396.

2.   **Mental Limitations:**

The record also reveals that Plaintiff has been treated for mental impairments to include depression, anxiety disorder, and malingering. Tr. 292-300, 343-346, 348-352. He reported symptoms to include an irrational fear for his safety, nervousness, and a general dislike of others. Plaintiff was apparently convinced he suffered from bipolar disorder and schizophrenia, which he had self diagnosed via the internet. He was also very invested in diagnostic labels. Interestingly, none of the doctors or therapists evaluating him found any evidence of psychosis or bipolar disorder.

However, the evidence does indicate that Plaintiff had a history of polysubstance abuse and had been involved in both the manufacture and the distribution of methamphetamine. Although he claimed to have been clean for several years, Dr. Kralik found many of his reported symptoms to be consistent with methamphetamine-induced psychosis. *See Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000) (claimant has initial burden of showing that alcoholism or drug use is not material to finding of disability; key factor is whether claimant would still be found disabled if she stopped using drugs and alcohol). And, she opined that his continued involvement in illegal activity would explain his irrational fears regarding his safety. Dr. Kralik also felt that his part-time work schedule could be a cover, as it would allow for his continued involvement in the drug trade. Although she did diagnose him with antisocial personality disorder, adjustment disorder, and polysubstance abuse in alleged full remission, Dr. Kralik found most of his allegations to be either associated with medical issues, not credible, or not described in any manner suggesting they prohibited employment. His behavior simply did not suggest a chronic mental illness of psychotic

18

proportions.  And, she indicated that the validity of her assessment was questionable, due to his limited effort and questions regarding the possibility of malingering and/or exaggeration.  Tr. 292.

Dr. Beyga and Mr. Pennington also voiced their suspicions that Plaintiff was malingering. In August 2008, Dr. Beyga diagnosed Plaintiff with depressive disorder, psychotic disorder, and questionable malingering.  Tr. 416-419.  Mr. Pennington also cited the following symptoms in support of his diagnosis of malingering: client has clearly exaggerated or invented symptoms in pursuit of his goal to obtain disability, client seeks financial gain, client's facial features or affect have never reflected depression or any other psychiatric illness, client has routinely indicated he wanted disability, client would ask symptoms of a disorder and then state that he had those symptoms, client appeared rehearsed in each session as to his symptoms, client never was able to give the same symptom consistently from one session to the next, client could never relate a hallucination to a purpose, client consistently called attention to his illness of psychosis, and client consistently attempted to take control of the interview and behaved in an intimidating manner.  Tr. 421-422.  While Dr. Beguesse, did not mention malingering in her assessment of Plaintiff, we note that she saw him on only two occasions, whereas Mr. Pennington provided him with psychotherapy on at least four occasions.  The record also reveals that Mr. Pennington had treated him at the Day Room, although no formal records of those sessions were kept.  As such, it seems clear to the undersigned that Mr. Pennington would be in a better position to diagnose Plaintiff's condition than a doctor who saw him only twice for the sole purpose of assessing the effectiveness of his medication therapy.

Dr. Kralik also stated that, even if his symptoms were taken at face value, Plaintiff admitted that his mental impairments did not preclude occupational functioning.  And, additional evidence, including the fact that Plaintiff did continue to work part-time, reported the ability to get along well

enough with others to get jobs, managed to find a girlfriend and sustain a romantic relationship with her, and was able to play chess both online and in person, in spite of these alleged symptoms, weighs heavily against a finding of disability due to mental impairments.

**3.      Activities of Daily Living:**

Plaintiff's own reports concerning his daily activities also undermine his claim of disability. On June 5, 2007, Plaintiff completed an adult function report, stating that he could care for his cat, care for his personal hygiene, prepare simple meals daily, weed eat the yard (takes all day), perform other yard work, perform light chores around the house, drive a car, go out alone (although he prefers not to), shop in stores for groceries and cigarettes, count change, use a checkbook/money orders, watch television, play chess online and locally, go to the Day Room on Thursday mornings, and attend medical appointments. Tr. 173-178. A second function report was completed on September 29, 2007. Tr. 209-214. At this time, he also reported that he had a girlfriend, talked on the phone, and talked to people online. Tr. 34, 213, 394, 420. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor). Further, Plaintiff continued to work, albeit it part-time, through at least through August 2007. Tr. 243-246, 295, 343-346, 392-396. *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.

20

We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity."); *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005) (absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work). He also reported performing yard work and fixing his mother's car on at least two occasions. Tr. 46, 394, 420. Clearly, these activities are inconsistent with his allegations of disability.

### B.   The ALJ's RFC Assessment:

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of the non-examining, consultative doctors. On June 25, 2007, Dr. Steve Owens completed a physical RFC assessment. Tr. 301-308. After reviewing only

21

Plaintiff's medical records, he concluded Plaintiff could perform a full range of medium level work. Tr. 301-308.

On July 23, 2007, Dr. Kay Gale completed a psychiatric review technique form and a mental RFC assessment. Tr. 363-380. She reviewed Plaintiff's medical records and diagnosed him with depressive disorder not otherwise specified, personality disorder not otherwise specified, and rule out antisocial personality disorder. Dr. Gay concluded Plaintiff would be moderately limited with regard to understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; and, performing at a consistent pace without an unreasonable number and length of rest periods. She indicated Plaintiff could perform work where the interpersonal contact was incidental to the work performed, the complexity of the tasks was learned and performed by rote with few variables, the tasks required little judgment, and the supervision required was simple, direct, and concrete. Dr. Gale also found no episodes of decompensation. Tr. 363-380. This assessment was affirmed by Dr. Jerry Henderson on November 30, 2007. Tr. 402.

We also have records from Plaintiff's therapist, Mr. Pennington, the two psychiatrists at WACGC who oversaw his medication management, and the evaluation of Dr. Kralik. Plaintiff contends that the ALJ erred by relying on Mr. Pennington's diagnosis of malingering, given the GAF scores he was assessed with during the relevant time period. However, a particular GAF score does not warrant a finding of disability. Instead, disability determinations should be made on a case by case basis, considering all the evidence, not just a GAF result. *Lozada v. Barnhart*, 331 F.Supp. 2d 325, 334 (E.D. Penn. 2004); *Purvis v. Commissioner*, 57 F.Supp. 2d 1088, 1093 (D. Oregon 1999). Thus, if the GAF is inconsistent with overall evidence concerning Plaintiff's

22

limitations, it is not entitled to controlling weight.  *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010).

In April 2007, Mr. Pennington assessed Plaintiff with a GAF of 60, which is indicative of moderate symptoms.  Tr. 346.  *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).  Dr. Beguesse assigned him with a GAF of 50 in June 2007, indicating the presence of a serious impairment.  Tr. 350.  *Id.*  Then in 2008, after being non-compliant with therapy for one year, Dr. Beyga assessed him with a GAF of 45, again indicative of serious symptoms.  *Id*.

We note, however, that Dr. Kralik also found that Plaintiff's level of functioning was somewhat impaired for occupational purposes in the following areas: activities of daily living, social adequacy (communication and social functioning), capacity to sustain persistence in completing tasks, and capacity to complete work-like tasks within an acceptable time frame.  Tr. 298-299.  Further, she determined that Plaintiff's level of functioning was adequate for occupational purposes in the areas of communication skills, capacity to cope with the typical mental/cognitive demands of basic work-like tasks, and ability to attend and sustain concentration on basic tasks. Tr. 299.  And, of particular significance is the fact that Dr. Kralik found that even if all of Plaintiff's allegations were taken at face value, Plaintiff himself acknowledged that his mental symptoms did not preclude occupational functioning. Tr. 300.  The consultative examiner, Dr. Gale, agreed and found that Plaintiff was able to perform work where interpersonal contact was incidental to the work performed, where the complexity of tasks was learned and performed by rote with few variables and little judgment, and where the supervision required was simple, direct, and concrete.  Tr. 377-380.

Accordingly, we conclude that the ALJ gave good reasons for discounting the low global-assessment-of-functioning ratings of Plaintiff's treating mental health providers. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (ALJ may elect in certain circumstances not to give controlling weight to treating physician's opinion, as record must be evaluated as whole; for treating physician's opinion to have controlling weight, it must be supported by medically acceptable diagnostic techniques and not be inconsistent with other substantial evidence in case record; physician's own inconsistency may diminish or eliminate weight accorded to his opinion). And, we find substantial evidence to support the ALJ's mental RFC assessment. We can find no error in the ALJ's failure to order a second psychological evaluation with additional testing, as the evidence before the ALJ provided ample information for him to make an informed decision regarding Plaintiff's RFC. *See Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (holding "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").

Likewise, for the reasons enumerated in the section addressing Plaintiff's subjective complaints, we also find substantial evidence to support the ALJ's physical RFC assessment. There are simply no medical records to indicate Plaintiff's impairments were any more limiting. His chronic bronchitis was obviously not severe enough to motivate him to stop smoking or to interfere with his daily activities. It did not result in extensive hospitalization or treatment, and there is no evidence that his alleged shortness of breath necessitated oxygen therapy. As such, we do not see how further assessment of his lung impairment would change the outcome of this case. *See id.*

Further, the combination of his various aches and pains, alleged lung restrictions, and mental impairments did not prevent him from continuing to perform some part-time work, fix his

mother's car, and do yard work.  And, aside from one notation that Plaintiff would have weight lifting restrictions for one week, his treating doctors never limited his physical activity.  Given the mental health professionals' comments regarding the possibility of malingering, we simply can not say the ALJ erred in his mental or physical RFC assessment in this case.  There was ample evidence upon which to base such an assessment, and his findings are supported by substantial evidence.

### C.  Vocational Expert's Testimony:

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence.  *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The Vocational expert testified that a person who could perform medium level, unskilled work involving interpersonal contact incidental to the work performed could still perform work as a groundskeeper, dishwasher, and material handler.  Tr. 56.  However, Plaintiff contends that this assessment does not take into account the limitations resulting from his mental impairment and his lung impairment, thereby undermining the credibility of the vocational expert's opinion regarding his ability to perform work that exists in significant numbers in the national economy. However, as discussed in the sections above, the ALJ's assessment contains the impairments he

found to be substantially supported by the record as a whole.  Accordingly, we find the expert's testimony to constitute substantial evidence.

**V.    Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 28th day of December 2011.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)